| | |
|---|---|
| John Fitzgerald Powell, | File No. 17-cv-03018 (ECT/SER) |
| Plaintiff, | |
| v. | |
| Officer Robert Staycoff, Officer Tony Heifort, Officer Steve Vargas, Officer Steve Holt, and Sergeant John Kaczmarek, individually and in their official capacities; the City of Robbinsdale; and the City of Brooklyn Center, | **OPINION AND ORDER** |
| Defendants. | |

Kenneth U. Udoibok, Kenneth Ubong Udoibok, P.A., Minneapolis, MN, for Plaintiff John Fitzgerald Powell.

Andrew A. Wolf and Jason M. Hiveley, Iverson Reuvers Condon, Bloomington, MN, for Defendants Robert Staycoff, Tony Heifort, Steve Vargas, John Kaczmarek, and the City of Robbinsdale.

Daniel P. Kurtz and Ryan M. Zipf, League of Minnesota Cities, St. Paul, MN, for Defendants Steve Holt and the City of Brooklyn Center.

---

Plaintiff John Fitzgerald Powell asserts several claims against five police officers and the two cities that employed them, including claims under 42 U.S.C. § 1983. The police-officer defendants subjected Powell to an investigatory *Terry* stop as part of their search for a reported "man with a gun" near the North Memorial Hospital campus in Robbinsdale. The stop occurred on July 18, 2015, just after midnight and in the midst of a strong thunderstorm. The officers believed Powell might be the "man with a gun" because,

among other reasons, Powell initiated the confrontation with them and remained combative and agitated throughout the stop. During the stop, officers drew their firearms, forced Powell to lie face down in the street, handcuffed him, and transported him to a hospital entrance where, at the direction of a medical doctor but while Powell remained in the back of a squad car, a paramedic injected Powell with the anesthetic ketamine without Powell's consent. Ultimately, Powell was cleared as a suspect and was not criminally charged for his conduct. Powell alleges that the officers violated his First, Fourth, and Fourteenth Amendment rights. He also brings a conspiracy claim under 42 U.S.C. § 1985 and claims for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress under Minnesota law. Defendants seek summary judgment on qualified-immunity and official-immunity grounds. Those motions will be granted.

I

The background facts leading up to the interaction between Powell and the officers are undisputed. On July 17, 2015, just before midnight, nurse Katie Woods saw a man slumped over in his car inside a parking ramp at North Memorial. Wolf Aff. Ex. 1 ("Woods Statement") [ECF No. 60-1]. Because the man was unresponsive, Woods feared he was not alive; she went back inside the hospital to call security and to get help. *Id.* She returned to the man's vehicle with another North Memorial nurse, Carolyn Griggs. *Id.* The man awoke, and both women saw that he had a gun in his hands between his legs. *Id.* Griggs feared the man would kill himself, so she asked him for the gun. Wolf Aff. Ex. 2 ("Griggs Statement") [ECF No. 60-2]. Instead, the man began to load the gun and turn it toward her. *Id.* Woods and Griggs then ran inside to call 911. *Id.*

It is now clear that the "man with a gun" was not Powell. At the time, though, relatively little information about the man was communicated to law enforcement. At approximately 11:59 p.m., police received a 911 call from Woods regarding a weapons threat at North Memorial Hospital. Wolf Aff. Ex. 4 ("CAD") at 1 [ECF No. 60-4].[1] The dispatch call went out to five agencies that share a dispatch system, including the Cities of Brooklyn Center and Robbinsdale. Wolf Aff. Ex. 8 ("Holt Dep.") at 23 [ECF No. 60-8].[2] At 12:01 a.m., dispatch stated that there was "no desc[ription] on male or gun." CAD at 2. Thirty seconds later, dispatch updated officers that the male was "possibly Hispanic." *Id.* Initially, dispatch stated only that the car was a "blue compact 4 door." *Id.* at 1. Ten minutes later, dispatch updated the officers that there was a "lone male with purple or blue sedan." *Id.* at 3.

Within twenty minutes of the 911 call, the five officers named as defendants in this case responded to dispatch that they were en route. *Id.* at 2–4. Officer Steve Holt was with the City of Brooklyn Center ("Brooklyn Center Defendants") and Officers Robert Staycoff,

---

[1] "CAD" stands for "computer-aided dispatch." *See* Wolf Aff. ¶ 6 [ECF No. 60]; *United States v. Barrera-Omana*, No. 09-cr-47 (JMR/JJK), 2009 WL 2900328, at *1 & n.3 (D. Minn. Sept. 3, 2009) ("CAD is a system through which police officers can view the call information on laptop computers located in their squad cars."); *see also* Holt Dep. at 23–27. Separately, there is also a "base channel" that allows officers to communicate "car-to-car" via radio with other officers from their jurisdiction. Wolf Aff. Ex. 9 ("Heifort Dep.") at 36 [ECF No. 60-9]. The record does not include evidence of those base-channel communications.

[2] This opinion cites to the depositions and reports attached as exhibits to the Wolf affidavit [ECF No. 60], but Powell has proffered what appear to be identical copies of many of the same materials attached as a single exhibit [ECF No. 77-1] to the Udoibok declaration [ECF No. 77].

Tony Heifort, Steve Vargas, and Sergeant John Kaczmarek were with the City of Robbinsdale ("Robbinsdale Defendants"). They, along with other officers from several law enforcement agencies, searched North Memorial's two parking ramps but could not locate the suspect. *See id.*

Meanwhile, a large crowd was gathering at the North Memorial emergency-room entrance and lobby. *See id.* at 5. Around 12:32 a.m., North Memorial security requested police assistance with crowd control. *Id.* Plaintiff Powell was part of this crowd. Wolf Aff. Ex. 3 ("Powell Dep.") at 13 [ECF No. 60-3]. He had been at the hospital visiting a family member who had been shot. *Id.* After officers told the crowd to disperse, Powell left to retrieve his car. *Id.* at 14.

Around that same time, just before 12:40 a.m., two officers, Heifort and Holt, parked on the street behind the hospital near where Powell's car was parked. *See* CAD at 5. Heifort and Holt were "clearing cars" parked on Lowry Avenue, which is adjacent to a parking ramp that had been cleared already. Holt Dep. at 30–31; Wolf Aff. Ex. 9 ("Heifort Dep.") at 18–19 [ECF No. 60-9]; Brooklyn Center Defs.' Mem. in Supp. ("B.C. Mem. in Supp.") at 4 [ECF No. 67] (describing the area as "the last place to be cleared"); Robbinsdale Defs.' Mem. in Supp. ("R. Mem. in Supp.") at 6 [ECF No. 63] (same). Both officers had their firearms unholstered "based on the high level of threat" presented by a suspect with a gun. Holt. Dep. at 36; *see also* Heifort Dep. at 24. And it is here where Defendants' interaction with Powell would begin. To avoid repetition, a detailed description of the facts will occur in conjunction with the analysis of each of Powell's claims for relief.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted). "There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The facts will be viewed in the light depicted by the videotape, setting aside versions of the facts that are "blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.* at 380; *see, e.g.*, *Ransom v. Grisafe*, 790 F.3d 804, 807 (8th Cir. 2015).

## A

Powell brings several § 1983 claims against the five individual defendant police officers. His operative complaint states that he brings claims for "First, Fourth, [and] Fourteenth Amendment Violations," as well as "False Arrest, Detention, Assault, Battery and Use of Excessive Force." Am. Compl. ¶¶ 40–48 [ECF No. 33]. But to be clear, his § 1983 claims are limited to violations of the United States Constitution and do not encompass any alleged violations of Minnesota state law (assault, battery, and any Minnesota Constitution provisions against false arrest, detention, and excessive force). *See*

*Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000); *see also Guite v. Wright*, 976 F. Supp. 866, 871 (D. Minn. 1997) ("[T]here is no private cause of action for violations of the Minnesota Constitution."), *aff'd on other grounds*, 147 F.3d 747 (8th Cir. 1998).

Powell's amended complaint and summary-judgment brief do not clearly identify his theories of which actions by which officers violated which of his federal constitutional rights.[3]  (While this is more understandable at the time of pleading, it is less so at the summary-judgment stage, when the record is so fully developed.)  But the Court has, to the best of its ability, parsed out alleged § 1983 violations based on the specific constitutional right at issue, the specific police conduct at issue, and the specific police officer involved. *See Handt v. Lynch*, 681 F.3d 939, 941, 944–45 (8th Cir. 2012) (remanding for "the district court to engage in a full qualified immunity analysis" because the district court had previously "failed . . . to undertake the qualified immunity analysis as to each of the constitutional claims" and did not consider "the individual defendants' actions with respect to each of the constitutional claims").  Here, it makes sense to analyze Powell's § 1983 claims temporally: (1) those relating to the initial stop (Fourth Amendment); (2) those arising out of his continued detention for a show-up (Fourth Amendment); (3) those stemming from his involuntary injection with ketamine (Fourth and Fourteenth Amendments); and (4) those based on alleged retaliation for his verbal complaints (First Amendment).

---

[3]  Powell's counsel did not appear at oral argument, so the Court's understanding of his theories of liability is drawn from his amended complaint and summary-judgment brief.

Defendants assert that they are entitled to qualified immunity on all of Powell's claims. In determining whether the individual officers have qualified immunity, the Court asks: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted). Courts, in their sound discretion, may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As the party asserting immunity, Defendants have the burden of establishing the relevant predicate facts. *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). A § 1983 plaintiff can overcome qualified immunity only if there was a violation of a constitutional right and that right was clearly established at the time of the violation. *Parker v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015).

1

a

Returning to the scene on Lowry Avenue, officers Heifort and Holt were clearing cars parked on Lowry Avenue with their firearms unholstered "based on the high level of threat" presented by a suspect with a gun. Holt. Dep. at 36; *see also* Heifort Dep. at 24. Recall that this was the last place to be searched and the "man with a gun" had not yet been found. It is undisputed that it was raining so hard that it was difficult to see. *See, e.g.*, Powell Dep. at 14, 29. Moments before the encounter with Powell, officers Heifort and Holt can be heard on video discussing the limited suspect information available to them:

> Officer One: . . . Bluish-purple?
> Officer Two: Yeah, [stuttering] and I don't think I ever got any
> suspect info, which is [unintelligible].
> Officer One: She thinks he's Hispanic.

Gabler Aff. Ex. C ("Video") at 00:16–00:23 [ECF No. 68-3].[4]  According to Heifort, they had parked on Lowry Avenue, the street behind the hospital, "[a]bout [at the intersection with] Abbott [Avenue]," and were walking east towards York Avenue when they encountered Powell.  Heifort Dep. at 18, 34, 49.

Powell was parked on the street "around the back" of North Memorial on Lowry Avenue.  *See* Powell Dep. at 13.  To get to his car, he had to walk down a set of stairs.  *See* Holt Dep. at 32; Heifort Dep. at 32.  Powell's car was "across the street" from the stairs he descended, though it is unclear precisely how the scene was oriented.  Holt. Dep. at 34; *see* Heifort Dep. at 18–22, 31–35 (describing the cross streets and paths the Parties took).

"[B]efore [he] even got down the stairs," Powell could see officers' flashlights on his car.  Powell Dep. at 14.  He testified that he knew the officers were police from the very start.  *See* Powell Dep. at 81 ("[W]hen I first saw my car, I knew they were police officers."); *see also id.* at 39 ("They made that very clear when they yelled at me to put my hands up.").  The officers were in full uniform.  Holt Dep. at 35.

---

[4]  Any citations herein to "Video" are to the synced video created by fusing audio and video from two squad-car dash cameras (Holt and Vargas), one body-worn audio camera (Holt), and one squad-car backseat camera (Vargas).  *See* Gabler Aff. ¶¶ 9–15 [ECF No. 68].  Plaintiff does not dispute the authenticity of this synced video.  *See* Mem. in Opp'n at 7 n.3 [ECF No. 76].  Both officers have submitted declarations stating that this synced video "is . . . a true and accurate depiction" of officers' interactions with Powell that night.  Vargas Decl. ¶ 4 [ECF No. 69]; Holt Aff. ¶ 5 [ECF No. 70].  The citations are formatted with minutes and seconds; these timestamps do not reflect the actual time of day.

When Powell was near the top of the stairs, "in the dark part of the stairs," he began to interact with the officers. *See* Heifort Dep. at 26. (Because the video footage is exclusively from Holt's dash cam at this time, there is not clear video of the stairs or the area where Powell and the officers converged.) The audio records the following interaction:

> Powell: Get the fuck away from my car!
> Officer: Stay back!
> Powell: Get the fuck out of my car!
> Officer: Hey, stay back. Police!
> Powell: Stay back from what!?!
> Officer: Put your hands up right now!
> Powell: For what!?!
> Officer: Stay back!
> Powell: From what!?!
>     [unintelligible]
> Officer: Put your hands up and keep them up now!
>     [unintelligible]
> Officer: Keep your hands up!
> Powell: Come get me!
>     [unintelligible]

Video at 00:44–01:37.

Heifort testified that Powell "continued to come at [officers Heifort and Holt] after giving [him] commands" to stay back. Heifort Dep. at 24 ("Some may define it as [charging at us]. I define it as aggressively coming after me."); Holt Dep. at 42, 46, 49. And according to Holt, Powell "continued to be aggressive," "hostile," and "confrontation[al]" in his words, tone, and demeanor, even after they identified themselves as police. Holt Dep. at 37–42. This prompted Heifort and Holt to point their guns at Powell. *Id.* at 49, 58 (describing how he completed a use-of-force report because he pointed his gun at Powell); Heifort Dep. at 25. When Powell became noncompliant with

the officers' commands, Holt "feared that he could possibly be the suspect" because of his erratic behavior. Holt Dep. at 47.

After Powell "eventually . . . put his hands up," after "multiple commands," Heifort Dep. at 26, the officers ceased telling him to stay back and instead directed him into the street toward them, *see id.* at 28 ("We wanted him off of the sidewalk, out into the lit area."). That interaction can be heard on the video, and parts of it can be seen as well:

> Officer: Start walking towards us with your hands up!
> Officer: Walk towards us, with your hands up!
> Officer: Do it now!
> Officer: Walk towards us, hands up!
>     [unintelligible]
> Officer: Hands up, keep 'em up! Drop to your knees!
> Officer: Drop to your knees!
>     [unintelligible]
> Powell: What have I done!?! What have I done!?! What the fuck have I done, huh!?!
>     [unintelligible]
> Powell: Y'all pulled guns on me! You got me out here in the fuckin' rain!
>     [unintelligible]
> Officer: Lay on your stomach!
>     [unintelligible]
> Officer: Hands off to your side, lay on your stomach!
>     [unintelligble]
> Officer: Palms up! Get your palms up!
>     [unintelligible]
> Powell: My palms is up!

Video at 01:43–02:39. Powell admitted that when the officers asked him to get down on the ground, he initially disagreed but then complied. Powell Dep. at 38. He "eventually . . . knelt down," after the officers yelled "multiple times." Heifort Dep. at 28.

At some point after Powell got down to his knees, three additional Robbinsdale police officers arrived to the scene: Kaczmarek, Staycoff, and Vargas. *See* Wolf Aff. Ex. 5

("Vargas Dep.") at 13 [ECF No. 60-5]; Wolf Aff. Ex. 11 ("Staycoff Dep.") at 19 [ECF No. 60-11]. Vargas ordered Powell to lay on his stomach and spread his arms out perpendicular to his torso, or "to prone out." Vargas Dep. at 14–15 ("[I]t's a standard for taking a high risk individual into custody is to prone them out."). Staycoff and Vargas then put him in handcuffs. Vargas Dep. at 16; Staycoff Dep. at 25; Wolf Aff. Ex. 12 ("Kaczmarek Dep.") at 28 [ECF No. 60-12]; Wolf. Aff. Ex. 7 ("Robbinsdale Incident Rep.") at 4, 9 [ECF No. 60-7].

Powell testified that they "put the handcuffs on . . . super tight." Powell Dep. at 47. Staycoff testified that he "double locked the cuffs," which is a "locking mechanism" that "means the handcuffs can no longer tighten up anymore." Staycoff Dep. at 25–26. It is Vargas's testimony that he did not put the handcuffs on tightly. Vargas Dep. at 16. According to Powell, three years later, the "[b]ruise still ain't gone away." Powell Dep. at 47. But Powell also testified that he has no physical injuries, only emotional and psychological injuries. Powell Dep. at 76.

Powell says that when he was proned out, one officer "[c]ame over, grabbed [his] arm, bent it all the way up." Powell Dep. at 69. Kaczmarek testified that he was the one who "grabbed [Powell's] left arm" and "stepped on his left forearm" with "one foot" for his own protection because he "believed [Powell] had a gun next to the left hand." Kaczmarek Dep. at 28, 32. Some of the officers initially mistook Powell's silver keys for a gun. *See, e.g.*, Heifort Dep. at 27 (describing a "silver object" in Powell's hands "that was later determined to be keys"); Holt Dep. at 60–61 (testifying he did not recall seeing either keys or a gun); Kaczmarek Dep. at 28–29 (testifying "I believed he had a gun" but

that officers later determined it was keys); *see also* Video at 01:59–02:01 (officers yelling "drop to your knees" and possibly "drop your keys"). Shortly after getting Powell on the ground in handcuffs, the officers were able to determine that he did not have a weapon in his hand. *See* Vargas Dep. at 16; Staycoff Dep. at 24; Kaczmarek Dep. at 29. Vargas performed a pat-down to confirm Powell did not have a weapon elsewhere on his person. Vargas Dep. at 16, 20. In total, this initial encounter lasted fewer than four minutes, from the moment Powell first spoke to the officers, Video at 00:44, to when he was placed in the back of the squad car, *id.* at 04:18. He laid on the ground "proned out" for approximately one minute. *See id.* at 02:34–03:25.

Powell maintains that once he was handcuffed on the ground, the officers "could see exactly who [he] was"—*i.e.*, that he was not Hispanic as the "man with a gun" had been described. Powell Dep. at 40. The officers' testimony corroborates the same. Vargas Dep. at 14 ("Q: . . . Could you tell that he's a black man? A: Once you get close and you have all of the lights, yes."); Holt Dep. at 46–47 (agreeing that he could tell Powell "did not fit [the] suspect" description); Heifort Dep. at 40; Staycoff Dep. at 23–24; *see also* Mem. in Opp'n at 36 [ECF No. 76] (calling himself "a very dark skinned black man").

b

Based on this initial encounter with officers, Powell brings two § 1983 claims for the violation of his Fourth Amendment rights, alleging an unconstitutional seizure and the excessive use of force (the latter based on the officers pointing their guns, handcuffing him too tightly, and stepping on his arm). Am. Compl. ¶ 43; Mem. in Opp'n at 29–36.

The Fourth Amendment protects against unreasonable searches and seizures, but it does not prevent all searches and seizures. A common example is an "investigatory detention"—a "*Terry* stop." *See Terry v. Ohio*, 392 U.S. 1, 28 (1968). The Eighth Circuit has identified three "noncontroversial and well-established principles" regarding investigatory detentions:

> First, the scope of an investigatory detention under [*Terry*] is limited. While an officer may conduct a limited, warrantless search of a suspect if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous, the scope of such a search must be confined to a search reasonably designed to discover concealed weapons. The sole justification for such a search is the protection of the officer and others. Because of the limited scope of an investigatory detention under *Terry*, officers must use the least intrusive means that are reasonably necessary to protect officer safety.
>
> Second, where an officer exceeds the permissible scope of *Terry*, the investigatory detention is transformed into an arrest.
>
> Third, a *Terry* stop that becomes an arrest must be supported by probable cause.

*United States v. Aquino*, 674 F.3d 918, 923–24 (8th Cir. 2012) (cleaned up).

The threshold inquiry is whether the officers had reasonable suspicion: "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (citations omitted). Reasonable suspicion is "a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006) (citations omitted). Whether there was reasonable suspicion is a totality-of-the-circumstances inquiry. *See United States v.*

*Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) ("There is no place in this analysis for a divide-and-conquer approach that would isolate each cited factor and disregard it if a court could conceive of an innocent explanation." (cleaned up)).

Here, as a matter of law, the officers had reasonable suspicion to stop Powell. The following factors provided the officers with reasonable suspicion:

> (1) the nature of the call—a weapons threat of a "man with a gun" on the loose;
> (2) the time of night—nearing 1:00 a.m., and just an hour after the 911 call;
> (3) the location—a block from the hospital, and the only area left to be cleared;
> (4) the visibility of Powell's location—a severe downpour with limited visibility, darkness, and stairs shrouded by landscaping; and
> (5) Powell's demeanor and behavior—aggressive and hostile, swearing and yelling, and not complying with commands.

*See* B.C. Mem. in Supp. at 14; R. Mem. in Supp. at 22–23; *see also United States v. Quinn*, 812 F.3d 694, 697–98 (8th Cir. 2016) ("Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." (citation omitted)); *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014) ("It was dark, [and] weather conditions were poor."); *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992) (considering the "nature of the crime" and whether "the suspect[] might be armed" (footnote and citation omitted)); *United States v. Juvenile TK*, 134 F.3d 899, 903–04 (8th Cir. 1998) (focusing on "temporal and geographic proximity," combined with a "matching description" of the vehicle and suspect). The officers had more than just a "hunch" that Powell may have been the suspect, and the circumstances they confronted exceeded the

"minimal level of objective justification." *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019) (citations and internal quotation marks omitted).  Even absent Powell's demeanor and behavior, the officers likely had reasonable suspicion, or at least arguable reasonable suspicion, to stop and clear anyone in the vicinity as a suspect.

The second step of the reasonable-suspicion inquiry is whether the officers exceeded the scope of the *Terry* stop and transformed the stop into an arrest.  No bright line separates a *Terry* stop from an unlawful arrest.  *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("Much as a 'bright line' rule would be desirable . . . common sense and ordinary human experience must govern over rigid criteria."); *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) ("There is no 'litmus-paper test' or 'sentence or paragraph' rule to determine when, given the 'endless variations in facts and circumstances,' police-citizen encounters exceed the bounds of mere investigative stops." (citation omitted)).  "An investigative detention may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force."  *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (citation and internal quotations marks omitted).  The length of Powell's detention did not convert it into an arrest; it lasted a mere four minutes, and Powell was physically restrained on the ground for less than a minute.  *See* Video at 02:34–03:25; *Williams v. Decker*, 767 F.3d 734, 741 (8th Cir. 2014) ("Taking roughly thirty minutes to accomplish this investigation did not run afoul of the Fourth Amendment." (collecting cases)).

The force the officers used during the investigatory stop, on the other hand, requires a closer look to determine whether as a matter of law the *Terry* stop did not become an

arrest. The Eighth Circuit has identified various factors for courts to consider in determining whether police have exceeded the permissible scope of a *Terry* stop:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Raino*, 980 F.2d 1148, 1149–50 (8th Cir. 1992) (citation omitted). Here, the nature of the crime as a weapons threat militates in favor of concluding the officers did not exceed the scope of the stop. Particularly when the weapons threat is considered in light of the crowd of thirty or forty people nearby in the emergency room, it becomes all the more imperative for officers to locate the "man with a gun" and neutralize the threat.[5] *Cf. Raino*, 980 F.2d at 1150 (concluding "officers' actions did not exceed the bounds of an investigative stop" where they "were responding to a late night call in an area where there had been . . . reports of shots fired" and "there was a large group of people gathered" nearby). Additionally, Powell's erratic behavior and remarks justified the force used. Not

---

[5] Officers understandably considered this weapons threat of a "man with a gun" to be serious. *See, e.g.*, Holt Dep. at 36; Vargas Dep. at 15. But to the extent Defendants call it a possible active-shooter or mass-casualty situation, *see* R. Mem. in Supp. at 3; B.C. Mem. in Supp. at 3, there is no record support for this characterization. Though it would be reasonable to fear that the "man with a gun" could escalate into a more catastrophic event, given the crowd gathered at the hospital, the police records and deposition testimony contradict this theory. *See, e.g.*, Robbinsdale Incident Rep. at 9 (calling the weapons-threat and crowd-control calls "unrelated"); Vargas Dep. at 11–12 (same); Kaczmarek Dep. at 17–18 (testifying that he had no concern the man with a gun would be in the crowd because "there wasn't a threat present [in the crowd]").

only did Powell question the officers' commands to "stay back," he made the aggressive comment, "come get me." Video at 00:59–01:35. Powell did not promptly comply with officers' simple directions, ranging from "stay back" to "put your hands up." *Id.* at 00:59–01:52. The officers' use of force was therefore reasonable under these circumstances.

No doubt some of the officers' actions in the course of the initial stop bear the markings of an ordinary arrest: pointing their guns, proning Powell out on the ground, handcuffing him, and patting him down for a weapon. *See Hosea v. City of St. Paul*, 867 F.3d 949, 956 n.5 (8th Cir. 2017) (describing "[b]eing ordered to the ground, handcuffed, and transferred to a police vehicle" as "consistent with an arrest—not a mere investigative stop" (citation omitted)). But none of these actions, independently or taken together, automatically convert the interaction into an arrest. *See, e.g.*, *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) ("[T]he use of handcuffs did not convert this *Terry* stop into an arrest." (collecting cases)); *Fisher*, 364 F.3d at 973 ("It is well established, however, that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons . . . ."); *El-Ghazzawy v. Berthiaume*, 708 F. Supp. 2d 874, 882 (D. Minn. 2010) ("Handcuffs are a hallmark of a formal arrest. [But t]he use of handcuffs does not *always* convert an investigative stop into an arrest. However, several circuits have noted that under ordinary circumstances, the use of handcuffs generally exceeds the scope of a lawful investigative detention." (cleaned up)). The officers had their guns unholstered even before they encountered Powell, reflecting the serious nature of the weapons threat. Holt. Dep. at 36; *see also* Heifort Dep. at 24. Powell escalated the situation, which prompted the officers to point their guns, prone

him out, handcuff him, and pat him down.[6]  Though the officers detained Powell in a manner that bears some hallmarks of a traditional arrest, the brief length of the initial detention and reasonable use of force nonetheless comports with *Terry*.  Accordingly, to the extent that Powell's § 1983 claims are predicated on an unconstitutional seizure during the initial *Terry* stop, they will be dismissed.

The officers' use of force requires additional consideration based on Powell's allegations that the officers used excessive force by handcuffing him too tightly, stepping on his arm, and pointing their guns at him.  *See* Mem. in Opp'n at 32, 34.  "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances."  *City of Golden Valley*, 574 F.3d at 496 (citations omitted).  Under that standard, the Court must evaluate all of the facts and circumstances surrounding the use of force, "careful[ly] balancing . . . the nature and quality of the intrusion on [Powell's] Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and internal quotation

---

[6]     Powell complains that "[t]he initial use or show of force by the officers against [him] is in conflict with their treatment of the couple they encountered earlier."  Mem. in Opp'n at 32.  As the Brooklyn Center Defendants explain, Holt made two stops before he encountered Powell, captured by his squad-car video and body-mic audio.  *See* B.C. Reply Mem. at 5 n.1 [ECF No. 80].  First, Holt stopped a man and a woman in a parked vehicle; he held a rifle, ordered the driver to put his hands on the wheel, and cleared the couple of any involvement within three minutes.  *Id.* (citing Gabler Aff. Ex. A at 13:50–16:40 [ECF No. 68-1]).  Second, Holt stopped a male pedestrian; he asked to see the pedestrian's hands, patted him down, and cleared him as a suspect in less than one minute.  B.C. Reply Mem. at 5 n.1 (citing Gabler Aff. Ex. A. at 38:00–38:50).  During Holt's second stop, he commented, "There's a little bit of a serious situation. . . . We're checking everyone, we don't have a suspect information."  Gabler Aff. Ex. A at 38:40–38:44.

marks omitted). "Once the predicate facts are established, the reasonableness of the [officers'] conduct under the circumstances is a question of law." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (citation omitted).

As for the handcuffs, there is some dispute about just how tightly they were put on. Powell says they were "super tight," Powell Dep. at 47, but officers Vargas and Staycoff testified they were not too tight, Staycoff Dep. at 26; Vargas Dep. at 16. There is also a dispute about the extent of Powell's alleged injuries; Powell testified that he is bruised to this day, but also that he has no enduring physical injuries. Powell Dep. at 47, 76. Neither of these possibly disputed facts are material, however, because the Eighth Circuit has said that "[f]or the application of handcuffs to amount to excessive force, there must be something beyond minor injuries." *Hanig v. Lee*, 415 F.3d 822, 824 (8th Cir. 2005) (citation omitted). "Handcuffing inevitably involves some use of force and it almost inevitably will result in some irritation, minor injury, or discomfort." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (citations and internal quotation marks omitted). In fact, the Eighth Circuit has expressly held that "being handcuffed too tightly [is] not tantamount to excessive force in the absence of medical records indicating . . . any long-term injury as a result of the handcuffs." *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003) (second alteration in original) (citation and internal quotation marks omitted). Powell has not provided any such medical records. Accordingly, his § 1983 claims will be dismissed to the extent they are predicated on the excessive force of too-tight handcuffs.

Powell alleges that the officers also used excessive force when one stepped on his arm. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted). Powell relies primarily on *Shekleton v. Eichenberger*, 677 F.3d 361 (8th Cir. 2012), and *Montoya v. City of Flandreau*, 669 F.3d 867 (8th Cir. 2012). *See* Mem. in Opp'n at 32. Those cases denying summary judgment on excessive-force claims are distinguishable, however, because Powell was not a non-threatening, non-violent individual. *See Shekleton*, 677 F.3d at 366 ("Shekleton was an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him."); *Montoya*, 669 F.3d at 871 ("[A]t the time Officer Hooper performed the 'leg sweep,' Montoya was not threatening anyone, was not actively resisting arrest, and was not attempting to flee."). True, Powell was not physically resisting or attempting to flee once officers proned him out. *See* Video at 02:32–03:25. But based on his earlier threatening comments and behavior, and the nature of the call as a weapons threat, officer Kaczmarek did not use excessive force in briefly stepping on Powell's arm. *See Graham*, 490 U.S. at 396. It was not objectively unreasonable that in the heavy rainstorm Kaczmarek initially thought Powell's silver keys could have been a weapon. *See id.* ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (citation omitted)); *see also* Kaczmarek Dep. at 24 ("I had a hard time seeing because I've never seen rain down pour like that before."); Powell Dep. at 14 ("[I]t started pouring even harder where I could barely

see."); Staycoff Dep. at 19 ("Well, due to the weather, the rain and thunder storm that was happening, there was very limited visibility."). Additionally, "although not dispositive, the severity of the injuries . . . sustained is a relevant factor in determining the reasonableness of the force used." *Montoya*, 669 F.3d at 872 (citing *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009)). Powell has identified no injuries associated with this alleged excessive force, far different from the broken leg that the plaintiff suffered in *Montoya*. 669 F.3d at 872.

Finally, Powell raises the possibility that the officers used excessive force by "aiming their weapons at [him]," holding him "at gunpoint" while he knelt on the ground and was proned out. Mem. in Opp'n at 34, 49. Though he cites no case law in support, this argument has some traction. "[A] police officer uses excessive force by pointing his service weapon at the head of a suspect who has dropped his weapon, has submitted to arrest, and no longer poses an immediate threat to the safety of officers or others." *Rochell v. City of Springdale Police Dep't*, No. 17-3608, 2019 WL 1859237, at *1 (8th Cir. Apr. 25, 2019) (per curiam) (unpublished) (citations omitted). And this right has been clearly established since at least September 2014, approximately one year before the incident in this case. *Id.* (citing *Wilson v. Lamp*, 901 F.3d 981, 989–91 (8th Cir. 2018)).

Here, the video shows that officers had their weapons unholstered at the scene even before encountering Powell. Video at 00:15; *see* Holt Dep. at 48. It also shows that several officers raised their guns as they approached Powell, though it is less clear whether they were pointed at Powell's head. Video at 02:25–02:52; *see* Holt Dep. at 48–49, 58. Such brandishing of weapons is not excessive force because Powell posed a threat to the safety

of officers until he was handcuffed and patted down for a weapon. *See Wilson*, 901 F.3d at 990 ("The officers' drawing and pointing of weapons as they approached the truck, which they reasonably believed was being driven by [the suspect for whom they had a warrant], was not excessive."). This is not a case where the detained individual had "complied with all commands and did not resist." *Id.*; *see, e.g.*, Holt Dep. at 40–42. Once the officers handcuffed Powell, they properly stopped pointing their guns at him. Video at 02:51–03:00; *see Wilson*, 901 F.3d at 990 (citation omitted) (concluding that "the continuous drawing and pointing of weapons constitute[d] excessive-force" where the officers kept their weapons drawn and pointed even after realizing they had the wrong guy and had patted him down). Accordingly, to the extent that Powell brings § 1983 claims based on excessive force during the initial stop, they will be dismissed.

2

a

After the roadside encounter, officers determined that they would take Powell to the hospital for a show-up with one of the eyewitnesses. It is not quite clear who made this determination. *See* Vargas Dep. at 22–23; Heifort Dep. at 40–41 ("[W]e brought him up to the emergency room under the canopy . . . . [b]ecause we had to determine if he was the suspect we were looking for regarding the gun incident with the nurse. . . . We were provided a description, a vague description. More times than not the description provided to us in a high stress situation from a victim is incorrect."); Staycoff Dep. at 35 (acknowledging Powell did not match the race of the suspect description, but noting that "[t]he descriptions that we get are oftentimes incorrect"). It seems as if all four

Robbinsdale officers had a role in deciding to take Powell to the hospital to conduct a show-up. *See* Heifort Dep. at 57 ("It wasn't just Officer Vargas and I. It was Staycoff and Sergeant Kaczmarek. . . . It wasn't a collective [decision]. . . . It was a common sense [decision]."); Kaczmarek Dep. at 51.

Vargas testified, consistent with his police report, that Powell tried to "break away" or "pull away" from the officers' hold during the walk to the squad car. Vargas Dep. at 18–21. The video does not clearly show Powell resisting, but one can hear Powell swearing at the officers—"fuck you," "you dirty motherfuckers," Video at 03:57–04:02—and an officer saying, "Keep your feet spread" and "Sir, stop resisting," *id.* at 04:04–04:11.

The ride in the squad car lasted under ninety seconds. *Id.* at 04:57–06:22. During the ride, Powell continued to swear at the officers. *Id.* ("You pussy ass motherfuckers," "Man, fuck you," "Pussy ass bitches"). But amidst the cursing, he also made exculpatory comments and pleas for his release, such as, "It ain't got nothing to do with me," "I ain't do shit," and "Get me the fuck up out of here right now." *Id.*

Around 12:45 a.m., the Parties arrived at the emergency-room entrance, which was under a canopy that protected the Parties from rain during the show-up. Vargas Dep. at 23; *see* Video at 06:22. Upon arrival, Sergeant Kaczmarek was the officer in charge. Heifort Dep. at 60; Staycoff Dep. at 44–45. It appears that Holt of Brooklyn Center accompanied the four Robbinsdale officers back to the hospital, but he did not participate in the show-up. *See* B.C. Mem. in Supp. at 8; Gabler Aff. Ex. A at 44:17–54:06 [ECF No. 68-1]; Wolf Aff. Ex. 10 ("Brooklyn Center Incident Rep.") at 2 [ECF No. 60-10]. As a matter of law, then, any alleged constitutional violations that occurred at the hospital must

be dismissed as to Holt. *See Wroblewski v. McKenna*, No. 12-cv-910 (ADM/FLN), 2013 WL 6328869, at \*6 (D. Minn. Dec. 5, 2013) (officer who was not present was "not reasonably implicated" in plaintiff's excessive-force claims).

Approximately a minute after arriving at the emergency room, Powell started kicking the door of the police car. *See* Video at 07:29; Vargas Dep. at 25. He can be seen on video kicking for several minutes. Video at 07:29–07:50, 08:07–08:14, 09:24–09:40, 09:49, 11:28. He continued to swear at the officers, claim his innocence, and plea to be released. *See id.*

Approximately five minutes after Powell arrived at the emergency room, the video provides some indication to believe that nurse Griggs came outside for the show-up. *See id.* at 11:28–12:19 (evidently showing a female in a red smock accompanying a police officer to the squad car). Powell testified that at the first show-up identification with nurse Griggs, during which she viewed him while he remained inside the back of the squad car, she said that he was not the suspect. *See* Powell Dep. at 31 ("They asked her, Was that him? She said No, he's Hispanic."), 34. But the officers testified that Griggs did not know if Powell was the man she had seen. *See* Heifort Dep. at 11, 51; Kaczmarek Dep. at 53–55. Even if Griggs did eliminate Powell as a suspect, as he contends, Powell was detained in the back of the police car at the hospital for around fifteen minutes total. *See* Video at 06:20–22:00.

b

It makes sense to separately analyze the detention on the street versus the detention at the hospital because of the way Powell frames his argument. He essentially argues that

after the officers had him proned out and handcuffed, they lost their reasonable suspicion because they were able to tell that he was black, not Hispanic. *See* Mem. in Opp'n at 30 ("Even after the officers discovered that he was not the suspect, they made no attempt to release Plaintiff."). This argument does not save Powell's Fourth Amendment unconstitutional-seizure claim from summary judgment. "The fatal flaw in [Powell's] approach is that he challenges the sufficiency of [individual] factor[s] in isolation from the rest. The totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis.'" *Quinn*, 812 F.3d at 698 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

Just as the handcuffing did not automatically convert the *Terry* stop into an arrest, neither did putting Powell in a police car or conducting a show-up at a new location. The Eighth Circuit expressly rejected a similar argument in *United States v. Martinez*, 462 F.3d 906, 908 (8th Cir. 2006). In that case, officers detained Martinez, a man who "matched the description of a bank robber," when they encountered him in a "recreational area . . . about a half-mile from the bank." *Id.* at 906. Martinez was cooperative, but the officers found a wad of cash in his pocket and found his explanations for the money's source to be suspicious. *Id.* The officers then handcuffed him, "placed [him] in the back of the police car, . . . and took him to the bank for a show-up identification." *Id.* The Eighth Circuit disagreed with Martinez's position "that placing him in a patrol car and transporting him back to the bank made the stop an arrest." *Id.* at 908. "[T]he exigencies were such that the officers could not dispel their suspicions that had prompted the *Terry* stop until they transported Martinez back to the bank for the show-up identification." *Id.*

So too here.  True, *Martinez* is distinguishable in that there the detainee's race matched that of the suspect.  And arguably the fact that officers found out Powell's race did not match the suspect cuts against reasonable suspicion.  But Powell, unlike Martinez, was not cooperative.  And Powell was found much closer to the scene of the initial incident, just a block away, whereas Martinez was located a half mile away.  Taken together, and viewed as a whole, it cannot be said that the officers lacked reasonable suspicion.  As a few of the officers testified, they did not place great weight on the race of the suspect because oftentimes eyewitnesses get it wrong.  *See, e.g.*, Heifort Dep. at 41, 43 ("More times than not the description provided to us in a high stress situation from a victim is incorrect."); Holt Dep. at 48 ("There was a possibility that anyone matching that vague description that was given could be the suspect."); *see also United States v. Mosley*, 878 F.3d 246, 252–53 (8th Cir. 2017) ("When evaluating tips, reasonable suspicion is dependent upon both the content of the information possessed by the police and its degree of reliability.").

Additionally, the officers were not in a position to judge possible gradients of skin color so as to entirely dispel their reasonable suspicion about Powell.  The term "Hispanic" could as easily apply to a person with light skin as to a person with darker skin, and dispatch had only indicated the suspect was "possibly" Hispanic.[7]  Just as it can be reasonable to

---

[7]    Powell's brief consistently refers to the suspect as "white or possibly light-skinned Hispanic male" or "light-skinned Hispanic or Caucasian."  *See* Mem. in Opp'n at 2, 3, 5, 10, 26, 36, 40, 50.  He cites primarily to the Robbinsdale police report and nurse Griggs's statement as support for this description.  *See id.*  The Robbinsdale police report, specifically Staycoff's narrative, does indicate that "Griggs stated that . . . she noticed a

mistake a woman for a man under certain circumstances, it is not inconceivable that someone could mix up a black man and a Hispanic man. *Cf. U.S. v. Barrera-Omana*, No. 09-cr-47 (JMR/JJK), 2009 WL 2900328, at *2 (D. Minn. Sept. 3, 2009) (recognizing that a woman with short or tied-up hair could have been mistaken for a man); *accord United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014). At night, in particular, such color-based misidentifications (either by the original eyewitness or by an officer) are not uncommon. *Cf. Wroblewski v. McKenna*, No. 12-cv-910 (ADM/FLN), 2013 WL 6328869, at *4 (D. Minn. Dec. 5, 2013) ("At night, black clothing, dark clothing, and blue jeans may be easily confused. . . . [The officer] made a reasonable decision to wait on releasing Wroblewski until he had more definite information.").

Though the Parties and the Court have not located a case discussing the impact of mistaken race on reasonable suspicion, there are several cases in which courts comment on a detainee's imperfect match with a vague description of a suspect. In *United States v. Quinn*, for example, the Eighth Circuit commented on how the officer "relied on a relatively generic suspect description" that the defendant "did not match perfectly" because he wore "a dark t-shirt" instead of the "blue hooded sweatshirt" from the description; the court concluded this "reliance was justified due to the lack of other pedestrians within the perimeter." 812 F.2d at 699 & n.2 ("We have held that generic suspect descriptions and

---

white or possibly light skinned Hispanic male slumped over in the front seat of the vehicle." Robbinsdale Incident Rep. at 3. But the precise terminology that Griggs used when giving her recorded statement was that the suspect was "maybe Hispanic, maybe Hispanic-Caucasian." Griggs Statement at 01:51–54. Regardless, the information the officers received via dispatch was only that the suspect was "possibly Hispanic." CAD at 2.

crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description."). And in *United States v. Witt*, the Eighth Circuit concluded that the officers had reasonable suspicion to detain a green station wagon with Nebraska plates even though the radio dispatch had described the robber's vehicle as "a dark green or black station wagon with Colorado license plates." 494 F. App'x 713, 715–16 (8th Cir. 2012). To be sure, race is a feature distinguishable from the color of clothing or a car—skin color cannot be shed the way an article of clothing can, and it is a characteristic far more likely to implicate discriminatory animus than the hue of a vehicle. But Eighth Circuit precedent reflects that officers are entitled to rely on overlap, however limited, with generic suspect descriptions as one factor in the reasonable-suspicion calculus. And the reasonable-suspicion inquiry is objective, not subjective. *See United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012).

The officers also could have gleaned additional information from the conclusion of the initial stop: that Powell's car did not match the suspect's, and that he did not possess a weapon. But again, these isolated factors do not create a genuine issue of material fact with respect to reasonable suspicion. Even though certain factors fell out of the reasonable-suspicion equation, the totality of the circumstances remained the same: based on the nature of the crime as a weapons call; Powell's proximity to the hospital, just a block away; the time of night; and Powell's erratic and combative behavior, which the officers deemed consistent with their profile of the suspect, the officers had reasonable suspicion to detain him and conduct a show-up. *Cf. United States v. Meier*, 759 F. App'x 523, 532 (8th Cir. 2019) (concluding that the continued seizure of a suspect was permissible even

once the officer learned that he was not "Jim" identified in the 911 call and did not have a weapon on him because "it was reasonable for [the officer] to continue investigating [him] until he verified whether [he] was the individual with the firearm, as described in the second 911 call"). The Robbinsdale officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly"—nurse Griggs arrived within minutes for the show-up, and Powell's entire detention from start to finish lasted under twenty minutes. *Sharpe*, 470 U.S. at 686 (declining to adopt a per se rule that a twenty-minute detention is too long under *Terry*); *see United States v. Dickson*, 58 F.3d 1258, 1264 (8th Cir. 1995) ("The witnesses arrived within 15 minutes [for the show-up]—a period, in our view, well within acceptable limits in the circumstances of this case.").

Even if the officers no longer had reasonable suspicion in light of these roadside revelations, the officers are entitled to qualified immunity on an alternate ground: they had arguable reasonable suspicion. *See, e.g.*, *Waters*, 921 F.3d at 736 ("If we determine that an officer lacked reasonable suspicion and thus conducted an unlawful *Terry* stop, [he] may nonetheless be entitled to qualified immunity if [he] had *arguable* reasonable suspicion—that is, if a reasonable officer in the same position could have believed she had reasonable suspicion."). Arguable reasonable suspicion is another way of saying that plaintiff cannot satisfy the "clearly established" prong of qualified immunity. Here, the officers had arguable reasonable suspicion because it was not clearly established that an officer cannot detain someone once it is determined that his race does not match the

suspect's description. As a result, Powell's § 1983 claims will be dismissed insofar as they are premised on an unconstitutional seizure during the ongoing *Terry* stop at the hospital.[8]

3

a

At some point, two paramedics stationed underneath the canopy, Brent Custard and Erick Shaft, became involved. It is undisputed that paramedic Shaft ultimately injected Powell with ketamine while Powell was detained in the back of the police car and that a doctor gave orders prescribing the sedative. Wolf Aff. Ex. 15 ("Shaft Dep.") at 7 [ECF No. 60-15]; Wolf Aff. Ex. 13 ("Custard Dep.") at 21, 32 [ECF No. 60-13]; Powell Dep. at 35; Wolf Aff. Ex. 14 ("Controlled Substance Utilization Sheet") [ECF No. 60-14]. Precisely how Custard and Shaft became involved in the incident, and how the doctor determined to prescribe ketamine, is less clear.

---

[8] The Robbinsdale Defendants also argue that the officers engaged in a community-caretaking function that justified the ongoing detention. R. Mem. in Supp. at 29–31; *see, e.g.*, *Tinius v. Carroll County Sheriff Dep't*, 321 F. Supp. 2d 1064, 1074–76 (N.D. Iowa 2004) (granting summary judgment on Fourth Amendment claim because "the Sheriff Defendants' actions . . . were reasonable and in keeping with their community caretaking functions when they detained Tinius," intoxicated and walking along a roadway without a coat in winter, transported him to the hospital, and later restrained him during the catheterization procedure). There is no need to go down that path of analysis, however. As previously discussed, the claims can be dismissed based on reasonable suspicion or arguable reasonable suspicion. Moreover, the community-caretaking exception to the warrant requirement is a somewhat amorphous legal doctrine with less clear applications to seizures of persons than decisions to impound vehicles. *See Winters*, 254 F.3d at 766 ("[T]he availability of the community caretaking function as an alternative to reasonable suspicion under *Terry* . . . is still a subject of debate in the courts."); *Tinius*, 321 F. Supp. 2d at 1074 (collecting cases "recogniz[ing] the existence of this community caretaking function and discuss[ing] its parameters"); *Ries v. State*, 920 N.W.2d 620, 629–30 (Minn. 2018) (discussing evolution of the "community-caretaker exception" to the warrant requirement).

According to Powell, he saw five or six police officers and paramedics "all huddled up" after the show-up. Powell Dep. at 34–35, 40–41. Vargas corroborates this testimony to some extent, saying that he "spoke with other officers trying to come up with a plan to calm [Powell] down" and that they did "discuss his behavior." Vargas Dep. at 24, 27. So does Staycoff. *See* Staycoff Dep. at 57 ("I believe we had a collective group discussion with the paramedics."). Kaczmarek, too, agrees that they "talked to the paramedics out front," and testified that he told the paramedics of his assessment that Powell was a danger to himself. Kaczmarek Dep. at 33–44, 75; *see also* Kaczmarek Dep. at 97 ("Q: [The paramedics] observed on their own, correct? A: I spoke with them. . . . We talked about our observations of Mr. Powell, yes.").

The first dispute is how the paramedics became involved, whether at the request of police or on their own. There is at least some testimony that the police asked for the paramedics to come over and assess Powell. *See, e.g.*, Shaft Dep. at 8–9 ("A police officer asked us for help to get [Powell] into the ER for evaluation."); Custard Dep. at 27–30 ("I believe I was summoned by one of the officers and had a conversation with him."); Kaczmarek Dep. at 75 (testifying that he "requested [the paramedics] to come over"). Viewed in the light most favorable to Powell, a reasonable person could conclude that the police affirmatively sought the paramedics' involvement.

Custard testified that the paramedics "did the best [they] could to assess [Powell] in a manner that kept both him as safe as possible and us," given Powell's behavior and "high level of agitation," including "the kicking, the flailing, the yelling, the shouting, the unwillingness to communicate, or inability [to communicate]" that he observed firsthand.

Custard Dep. at 49. He "told the officer that the patient appeared to be extremely agitated, and it would be unsafe to just take him out of the car and bring him into triage" and said, "let me go talk to the physician since we're on hospital grounds and we will try to get [the physician] outside so they can assess the patient." Custard Dep. at 31–32. Custard further testified that he then "walked back and forth to the ER talking to the physician," Dr. Adina Connelly, "about how to . . . best handle this situation and what she would like to do for a treatment." Custard Dep. at 23, 31.

The next dispute involves what, if anything, the officers communicated to the medical professionals that contributed (or not) to the medical intervention they administered. Powell believes that the police officers falsely told medical professionals that (1) Powell had assaulted someone and (2) he was foaming at the mouth. *See* Powell Dep. at 42 (discussing reading the officers' police report and saying "when I got to . . . the part . . . about me attacking them and all that, and I was like, What? It can't be true. This is false. Because I never attacked anyone. I never threatened anyone. I was never foaming at the mouth. So this is false.").

Viewed in the light most favorable to Powell, his medical records contain background information about the encounter that suggests police, directly or indirectly through the paramedics, did provide medical professionals with additional information about Powell's pre-hospital conduct. *See* Custard Dep. at 56 (testifying that a police officer "could have" or "could not have" come into the hospital with him to speak to the doctor). Specifically, Dr. Connelly's "impression and plan" provides as follows:

> The report is that, while the police were walking through the
> parking lot, this patient came up between two cars, not
> identified as the suspect they were even looking for, but then
> charged the police. They apprehended him, but could not
> complete questioning, and the patient became extremely
> agitated and was then attempting to assault police and break
> the car windows and paramedics were called secondary to
> safety concerns and possible assault of a paramedic. He was
> given ketamine and brought in for safety and evaluation to the
> emergency department. . . . I do not suspect acute neurologic
> event such as intracerebral hemorrhage, meningeal
> encephalitis, seizure disorder, etc. It would not be consistent
> with the previous, pre-hospital story.

Udoibok Decl. Ex. 2b ("Powell Medical Records") [ECF No. 77-1 at 56–57]. But the

medical records do not reveal whether the report of Powell's pre-hospital conduct

influenced Dr. Connelly's decision to prescribe ketamine; it is possible that she received

and documented this information about Powell's pre-hospital conduct only after his

conduct under the hospital canopy led to the ketamine injection and his admission.

Although numerous witnesses have been deposed, including all five officers and two

paramedics, Dr. Connelly was not deposed to testify to her recollections of the

communications and what factors led her to prescribe ketamine.

Powell speculates that the officers had a role in the decision to administer ketamine.

*See* Powell Dep. at 41 ("They're talking for about a few minutes, I don't know. He jumps

back out of the huddle, goes into the back of his truck and comes out with a glove and

syringes and a little vial. . . . So that tells me, they done told him to come shoot me up.").

According to both paramedics, the administration of ketamine was exclusively a medical

decision; no officer directed them to administer ketamine, nor would they have followed

such an order had it been given. Shaft Dep. at 17, 44–45; Custard Dep. at 68. They agree

that the order for the ketamine came from Dr. Connelly. Custard Dep. at 35–36, 102; Shaft Dep. at 10–11. Custard testified that he did not know why Dr. Connelly didn't come outside herself to assess the patient or administer the ketamine, but that "on the third or fourth time [he] went and talked [to her], the decision or the order was given by her to sedate [Powell]." Custard Dep. at 32, 35. Powell seems to agree that it was ultimately a medical decision, but his theory is that the officers "conspired" or "coordinated" with the paramedics, or otherwise "facilitated," "orchestrated," or "caused" it to happen. *See* Mem. in Opp'n at 27, 30, 38, 47–48.

After about three minutes, the ketamine took effect and Powell was removed from the police car and transferred onto a gurney. *See* Video at 18:20–18:37 (ketamine injection), 21:23–22:00 (removing Powell), 22:20–22:30 (wheeling gurney). Vargas opened the door of the police car and held Powell to assist the paramedics in giving the injection. Vargas Dep. at 29–30; *see* Video at 18:20–18:37. It appears that one officer, and possibly more, helped lift Powell onto the gurney. *See* Video at 21:57–22:25; Custard Dep. at 45. He was then admitted to North Memorial Hospital. *See* Powell Medical Records. Kaczmarek testified that he remained with Powell, even though he was no longer under arrest, because "the victim had come back to the room to do a [s]how-[u]p." Kaczmarek Dep. at 95. During this second show-up, nurse Griggs was able to conclusively

determine that Powell was not the man with a gun that she had seen.  Kaczmarek Dep. at 55.[9]

Powell was admitted to the emergency room and examined by Dr. Connelly at approximately 1:03 a.m.  *See* Powell Medical Records.  Her notes reflect that he had an "altered mental status," presumably due to the ketamine administration.  *Id.*  He was intubated due to "[r]espiratory insufficiency and secretions."  *Id.*  Thereafter, Powell was formally admitted to the hospital for further evaluation and treatment.  *Id.*

b

The Parties have provided the Court with limited direction on the viability of Powell's § 1983 claims arising out of the administration of ketamine; Powell himself devotes just one paragraph of his 53-page brief to the matter.  *See* B.C. Mem. in Supp. at 17–18; R. Mem. in Supp. at 34–36; Mem. in Opp'n at 43–44; *see also* Am. Compl. ¶¶ 42–44.  The Court has not independently been able to locate a single other case nationwide involving a § 1983 claim for the forced administration of ketamine.  On this point, Powell cites to *Washington v. Harper*, 494 U.S. 210 (1990), *Sell v. United States*, 539 U.S. 166 (2003), and *Scott v. Benson*, 742 F.3d 335 (8th Cir. 2014), for the proposition that detainees like Powell have a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs.  Mem. in Opp'n at 43–44.  The Parties refer to

---

[9]     Powell does not argue that the time he spent in the hospital following the administration of ketamine was an extension of the *Terry* stop, constituted an arrest, or otherwise violated his constitutional rights.

ketamine as a sedative, and Defendants do not seem to dispute Powell's suggestion that ketamine could qualify as an antipsychotic.[10]

The cases Powell relies on are not directly on point because they do not involve the forced administration of antipsychotic medications on a detainee in an emergency setting; they involve non-emergency decisions to forcibly treat prison inmates and civilly committed individuals with diagnosed mental-health conditions. Those courts did not have before them, and did not address, what due process requires when administering a drug outside the course of ongoing treatment for an inmate's existing condition. Still, in *Harper*, the Supreme Court clearly pronounced that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," 494 U.S. at 229, and there is reason to think that detainees like Powell are entitled to the same, if not greater, Fourteenth Amendment protections as inmates, *cf. Riggins v.*

---

[10]     There is limited information in the record about the nature of ketamine or the class of drugs that it belongs to. The Parties all refer to ketamine as a sedative. *See* Mem. in Opp'n at 1; R. Mem. in Supp. at 40; B.C. Mem. in Supp. at 9; *see also* Custard Dep. at 38 ("Dr. Connelly gave me an order . . . to go ahead and give Mr. Powell sedation using the medication Ketamine."). Powell seems to suggest that ketamine might qualify as an antipsychotic. *See* Mem. in Opp'n at 43–44. Defendants do not address this in their opening or reply briefs. The Court therefore operates with the understanding that ketamine is a sedative and possibly an antipsychotic. *See also Kelly v. Ford*, 543 S.W.3d 383, 395 (Tex. Ct. App. 2018) (reciting doctor's testimony that "[k]etamine is used an anesthetic induction agent, and has recently received attention as a drug of abuse for [its] hallucinogenic side effects," such as "hallucinations, delirium, [and] irrational behavior," as well as "seizures and cardiac arrhythmia"); *Neff v. Wofford*, No. CV 13-8460-AB (MAN), 2015 WL 6164866, at *3 (C.D. Cal. July 10, 2015) (describing ketamine as "an anesthetic which distorts the brain's ability to interpret sensory input causing disorientation and hallucinations," as well as "loss of memory"); *People v. Hartuniewicz*, 816 N.W.2d 442, 444 n.3 (Mich. Ct. App. 2011) ("Ketamine is a legitimate intravenous anesthetic . . . but it is also used as a hallucinogen by recreational drug users and as a date rape drug." (citations and internal quotation marks omitted)).

*Nevada*, 504 U.S. 127, 135 (1992) (recognizing that "[t]he Fourteenth Amendment affords at least as much protection to persons the State detains for trial" as it does to "convicted prisoner[s]").

Defendants Holt and the City of Brooklyn Center cite to *Anglin v. City of Aspen*, 552 F. Supp. 2d 1205 (D. Colo. 2008), for the limited proposition that "[a]s a non-medical professional, a reasonable law enforcement officer cannot be expected to question the judgment of [a] qualified medical professional absent some extraordinary circumstances, the nature of which the court cannot even conjecture at this point." *Id.* at 1225 n.4. At least one other court has similarly concluded that, as a matter of law, there cannot be liability against individuals that did not have authority to order the involuntary medication. *See Martin v. Kazulkina*, No. 12-cv-14286, 2017 WL 971706, at *11 (E.D. Mich. Feb. 21, 2017) ("Kazulkina's role in Martin's treatment was limited to recommending that he be considered for involuntary treatment with psychotropic medication . . . . Having no authority to order that Martin be involuntarily medicated, Kazulkina had no personal involvement in this matter, Martin cannot maintain an action against her, and Kazulkina's motion for summary judgment . . . should be granted."), *R&R adopted*, 2017 WL 958081 (E.D. Mich. Mar. 13, 2017), *appeal dismissed*, 2018 WL 1902497 (6th Cir. Mar. 9, 2018). Under that same rationale, Powell's ketamine-based § 1983 claims must be dismissed because the officers had no authority to order the medication. *See* Shaft Dep. at 44–45 (testifying that police officers "do not have the authority" to order paramedics to administer a drug, nor would he administer a drug if a police officer told him to); Custard Dep. at 68

("No member [of] a police department . . . has ever ordered me to give Ketamine, nor would I follow that order.").

This is not to say that officers are immunized from all liability for medical decisions made in criminal settings. In fact, the *Anglin* court denied summary judgment on the plaintiff's Fourteenth Amendment claims where there was a fact dispute about whether a law enforcement officer knowingly made a false report to medical authorities about the detainee's behavior that could have factored into the medical decision of whether to sedate the detainee. *Anglin*, 552 F. Supp. 2d at 1221–24. This is only to say that on the record before the Court, Powell has not carried his burden to show officer conduct that makes his Fourteenth Amendment claim viable. *See id.* at 1225 ("[I]f Deputy Geister did not, in fact, lie to the Paramedics . . . I would find no Fourteenth or Fourth Amendment violation here."). Even if Powell could show that the statements in his medical records about an assault and foaming at the mouth were intentional misrepresentations as he alleges, Am. Compl. ¶ 28, he has proffered no causational evidence to show that these statements were made before he was injected or that but for this information, Dr. Connelly would not have prescribed ketamine. *See Anglin*, 552 F. Supp. 2d at 1225 ("[A]bsent a finding that Deputy Geister made some false report *that affected the decision to sedate* Plaintiff, his assistance in restraining Plaintiff at the request of medical professionals and with no more force than necessary, could not have violated clearly established federal law."); *see also Johnson v. City of Shorewood*, 360 F.3d 810, 817–18 (8th Cir. 2004) ("It is not a court's obligation to search the record for specific facts that might support a litigant's claim . . . .").

In addition to a Fourteenth Amendment claim, Powell hints at a Fourth Amendment excessive-force claim for the officers' participation in the ketamine injection. *See* Mem. in Opp'n at 32, 35. The officers only use of force was to hold Powell during the injection and to assist paramedics in transporting and securing Powell on the gurney. It is not clearly established in the Eighth Circuit that police cannot assist medical personnel in administering a drug that a medical professional has determined is medically warranted. *See Tinius v. Carroll Cty. Sheriff Dep't*, 321 F. Supp. 2d 1064, 1078 (N.D. Iowa 2004) ("[T]he United States Supreme Court has not spoken authoritatively on the issue of the restraining of a person during a medical procedure being conducted for non-investigatory purposes, and the Eighth Circuit Court of Appeals also has never addressed this issue."). In fact, most of the legal authority is to the contrary—that officers have some obligation to assist medical personnel in this way. *See, e.g.*, *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) ("[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions' . . . . in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." (citations omitted)) (cited favorably in *Winters v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001)). They are expected to prioritize a detainee's need for medical treatment over the pursuit of criminal charges. *Cf. Hanson as Trustee of Layton v. Best*, 915 F.3d 543, 548–49 (8th Cir. 2019) (finding officers did not violate detainee's constitutional rights where they allowed paramedics to perform a medical assessment and stayed by his side while he was transported).

In *Samuelson v. City of New Ulm*, the Eighth Circuit held that a jury could not find officers violated any constitutional rights in transporting a man they believed to be hallucinating to a hospital against his will to be screened for a psychiatric hold. 455 F.3d 871, 877–78 (8th Cir. 2006). And in *Winters v. Adams*, the Eighth Circuit held that an officer was even entitled to qualified immunity on an excessive-force claim for punching a man, who had committed no illegal activity but was intoxicated with methamphetamine, in the course of transporting him to the hospital for evaluation and treatment. 254 F.3d 758, 766 (8th Cir. 2001). Of course there are limits to the use of force justified under these circumstances. *Winters*, 254 F.3d at 767 (Bye, J., concurring); *see, e.g.*, *Mann v. Darden*, 630 F. Supp. 2d 1305, 1317 (M.D. Ala. 2009) ("Even if, however, Darden were properly acting . . . in his capacity as a community caretaker . . . Darden would not be entitled to . . . immunity for the repeated use of his taser against Mann as she lay in her hospital bed."). But here, the officers are entitled to qualified immunity for the minimal force used in restraining Powell during the ketamine injection and transport into the hospital. Powell's Fourth Amendment claim therefore fails.

In granting summary judgment on Powell's Fourth and Fourteenth Amendment claims arising out of the ketamine injection, the serious mental and physical infringement on a person's liberty that ketamine sedation presents are not disregarded. The video here depicts the significant effects ketamine had on Powell's brain and body, and his medical records demonstrate that ketamine administration is not without risk. *See* Video at 18:29–22:00; Powell Medical Records. Future cases may, like *Anglin*, demonstrate that officers'

involvement in medical decision-making and treatment can cross the line into constitutional liability. But this is not that case.

4

a

Powell's final § 1983 claim is for a violation of his First Amendment rights. On this point, there is one disputed fact: whether an officer told Powell, at some point during this interaction, something along the lines of "shut up, or you will leave on a gurney." *See* Mem. in Opp'n at 43; Powell Dep. at 35 ("He told me to shut the F up or otherwise you're going to be going out of here on a gurney."), 63, 65, 71 (same). Powell does not clearly identify which officer said this, but it can be inferred that he alleges it was possibly Vargas. *See* Powell Dep. at 34–35 (testifying that it was the police officer whose car he was in that "came back and got in the car," and who held his arm for the ketamine injection, that made the gurney statement). Vargas, whose car Powell was in, does not recall ever saying that, but also does not explicitly deny it. Vargas Dep. at 33–34 ("Q: Was there any time that you told Mr. Powell to shut up, or he would leave in a gurney? A: I don't recall ever saying that."). Staycoff admits that during this time period he "did sit in the front seat of Officer Vargas's squad car," so it is also possible that it was Staycoff who said this. Staycoff Dep. at 46. Staycoff was not asked during his deposition whether he said this or not. Viewed in the light most favorable to Powell, the Court will accept that some officer did, in fact, make this comment.

b

The First Amendment retaliation claim is sparsely pleaded and briefed. *See* Am. Compl. ¶ 43 (alleging only that "Defendant officers' false arrest, detention and use of excessive force was unreasonable, and was in violation of Plaintiff Powell's First . . . Amendment rights"); Mem. in Opp'n at 42–43 (identifying the speech underlying his First Amendment retaliation claim). Powell frames this right in various ways—"the right to utter," "the freedom of inquiry and thought," and the right to criticize public officials. Mem. in Opp'n at 43. He says "[i]t was this specific right to 'utter' or 'inquire' that was chilled by the Defendant officers when they told Plaintiff to 'shu[t] up, or he would leave in a gurney.'" *Id.* He now seems to claim that the retaliatory action that resulted from Powell's exercise of his First Amendment rights was that he was sedated with ketamine. *Id.*[11]

---

[11] To the extent Powell claims that the retaliatory action was the detention itself, Defendants are entitled to summary judgment because there was reasonable suspicion. The Eighth Circuit has said that it "require[s] a fourth element" in retaliatory-detention cases: "that the defendant officers lacked reasonable suspicion or arguable reasonable suspicion." *Waters*, 921 F.3d at 742; *see, e.g.*, *Garcia v. City of New Hope*, No. 17-cv-03574 (NEB/ECW), 2019 WL 1237122, at *9–10 (D. Minn. Mar. 18, 2019) (granting summary judgment because there was reasonable suspicion for the traffic stop). Up until very recently, the Supreme Court had declined to opine on this fourth element. *See Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1953–54 (2018) (calling it a "difficult question[] about the scope of First Amendment protections when speech is made in connection with, or contemporaneously to, criminal activity"). But one month after the summary-judgment hearing in this case, the Supreme Court decided *Nieves v. Bartlett* and held that a plaintiff pursuing a retaliatory-arrest claim generally "must plead and prove the absence of probable cause for the arrest." 139 S. Ct. 1715, 1724–25 (2019). The logical extension of this holding is that in a retaliatory-detention case, the plaintiff must plead and prove the absence of reasonable suspicion. Powell has not done so here.

The First Amendment generally prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman*, 547 U.S. at 256). The retaliatory motive "must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (quoting *Hartman*, 547 U.S. at 260). Both the Eight Circuit and Supreme Court have acknowledged the difficulty of establishing this causational element when "the actor with alleged retaliatory animus," the police officer here, "is different from the actor taking the alleged adverse [] action," the paramedic injecting Powell with a sedative. *Scott v. Tempelmeyer*, 867 F.3d 1067, 1071–72 (8th Cir. 2017); *see also Nieves*, 139 S. Ct. at 1723 (discussing the "problem of causation" in retaliatory-prosecution cases, where "the official with the malicious motive does not carry out the retaliatory action himself—the decision to bring charges is instead made by a prosecutor" (citing *Lozman*, 138 S. Ct. at 1952–53)). Neither the Eighth Circuit or Supreme Court has addressed what additional or different burden plaintiffs must meet in the specific context of an alleged retaliatory action taken by a medical professional, as compared to a prosecutor or police officer, that is not susceptible to the probable-cause standard under the Fourth Amendment. But the Supreme Court's recent commentary in *Nieves* at least calls into question whether there is some objective test that supplements or supplants the subjective inquiry into the motivation of the allegedly retaliatory actor. *See Nieves*, 139 S. Ct. at 1723–25.

Whatever standard applies in this context, Powell has not come forward with sufficient evidence that his verbal criticism of the officers caused the medical decision to sedate Powell. If a subjective standard applies, Powell does not allege that but for his exercise of his First Amendment rights, the doctor would not have ordered the administration of ketamine. *Cf. Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (affirming grant of defendants' summary-judgment motion on First Amendment retaliation claim where plaintiff failed to proffer evidence connecting defendants to the alleged retaliatory acts and "comments . . . suggesting [the plaintiff] quit speaking out [were] not traceable to any action taken by [defendants] in retaliation for her exercise of a constitutionally protected right"); *Lozman*, 138 S. Ct. at 1953–54 (stating plaintiff "likely could not have maintained a retaliation claim" where there was "no showing" that the person committing the allegedly retaliatory act "had any knowledge of [the plaintiff's] prior speech"). If an objective standard were to apply, Powell has not alleged that he was treated differently than otherwise similarly situated individuals not engaged in the same sort of protected speech. *Cf. Nieves*, 139 S. Ct. at 1727. Accordingly, summary judgment in favor of Defendants will be granted on Powell's First Amendment claim, as well.

B

Having addressed and dismissed all of Powell's § 1983 claims, the Court turns to his § 1985 conspiracy claims. Powell's complaint states that the five officers "conspired with one another to violate and deprive Plaintiff Powell of his . . . First, Fourth and Fourteenth Amendment rights under the United States Constitution as well as rights protected under Art. 1, §§ 1, 2, 10 of [the] Minnesota Constitution." Am. Compl. ¶ 50. "It

is well settled . . . that § 1983," and § 1985 as well, "may be an avenue for relief only when a plaintiff asserts that violations of *federal* rights have occurred." *Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000). Furthermore, "there is no private cause of action for violations of the Minnesota Constitution." *Guite v. White*, 976 F. Supp. 866, 871 (D. Minn. 1997), *aff'd on other grounds*, 147 F.3d 747 (8th Cir. 1998); *see also Mlnarik v. City of Minnetrista*, No. A09-910, 2010 WL 346402, at *1 (Minn. App. Feb. 2, 2010) (explaining that "no private cause of action for a violation of the Minnesota constitution has yet been recognized" and that a constitutional claim alleged thereunder was not cognizable (internal quotation marks omitted)). Therefore, to the extent Powell's § 1985 claims are premised on violations of the Minnesota Constitution, or to the extent Powell intends to assert claims directly under the Minnesota Constitution, those claims will be dismissed.

Because there was no underlying constitutional violation, Powell's § 1985 conspiracy claim "necessarily fails." *Mendoza v. United States Immigration & Customs Enforcement*, 849 F.3d 408, 421 (8th Cir. 2017) (citing *Askew v. Millerd*, 191 F.3d 953, 957–59 (8th Cir. 1999)) (affirming summary-judgment dismissal of constitutional-conspiracy claim); *Larson by Larson v. Miller*, 76 F.3d 1446, 1456 (8th Cir. 1996) ("[A]bsent some evidence that the actions of these defendants either caused injury to the plaintiffs or intentionally prevented the plaintiffs from exercising a right or privilege granted them as United States citizens, there can be no liability under § 1985."); *cf. ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547 (8th Cir. 1991) ("[T]he simple fact of a conspiracy . . . will not alone support Sherman Act liability. The evidence must also

establish that the alleged participants . . . conspired to achieve an unlawful objective." (citation and internal quotation marks omitted)). Accordingly, Defendants' motions for summary judgment on Powell's § 1985 claims will be granted.

C

Powell brings several state-law claims, as well—alleging intentional infliction of emotional distress and negligent infliction of emotional distress by all five police officers, and negligence on the part of the two Cities.[12] Am. Compl. ¶¶ 71–84. Like Powell's federal claims, these claims cannot survive summary judgment.

1

Powell's complaint alleges that the officers intentionally inflicted emotional distress "when they arrested and detained Plaintiff Powell" as well as when they "caused the administration of Ketamine." *Id.* ¶ 73. For Powell to prevail on his intentional-infliction claim, "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) [the conduct] must cause emotional distress; and (4) the distress must be severe." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983). "[T]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. J (1965)).

---

[12] Defendants seem to believe they need to analyze the Cities' vicarious official immunity on these two state-law claims for intentional and negligent infliction of emotional distress—but there is no need to do so, given that Powell has not pleaded these claims against the Cities. *See* B.C. Mem. in Supp. at 20; R. Mem. in Supp. at 45; Am. Compl. at 13 (bringing claim for "Intentional/Negligent Infliction of Emotional Distress against Individual Defendants" and naming the five officers as defendants, not the Cities).

Powell's claim fails because the officers' conduct was not extreme and outrageous. *See also Oliver v. City of Minneapolis*, No. Civ. 04-3022 PAMRLE, 2005 WL 2406035, at *1, 9 (D. Minn. Sept. 27, 2005) (granting summary judgment to defendants on IIED claim where officer pointed a gun at plaintiff, stepped on plaintiff, kicked him in the jaw, dragged him, and slammed his head). As discussed in connection with Powell's § 1983 claims, the officers had reasonable suspicion for detaining him, and did not detain him for an unreasonably long time or use excessive force. And Powell has not shown that the officers impermissibly participated in the medical decision to administer ketamine. Under Minnesota law, intentional infliction of emotional distress "is 'sharply limited to cases involving particularly egregious facts and . . . a high threshold standard of proof is required to submit the claim to a jury.'" *Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1113 (D. Minn. 2017) (alteration in original) (quoting *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003)). Powell has not met that high threshold, so Defendants are entitled to summary judgment.

2

As for negligent infliction of emotional distress, "a plaintiff can recover for emotional disorders only if he (*a*) is within the zone of danger created by the defendant's negligence, and (*b*) exhibits physical manifestations of emotional distress." *Iacona v. Schrupp*, 521 N.W.2d 70, 72 (Minn. Ct. App. 1994). Defendants rightly argue that Powell was never in a "zone of danger" of physical impact, so his claim fails as a matter of law. B.C. Mem. in Supp. at 24; R. Mem. in Supp. at 39–40. Powell misapprehends the nature of the caselaw as to what qualifies as a "zone of danger." *See* Mem. in Opp'n at 49. Under

Minnesota law, negligent-infliction claims are "strictly limited to situations in which the defendant placed the plaintiff in grave physical danger," *Shank*, 232 F. Supp. 3d at 1112 (citation omitted), something like a near-crash of an airplane, *see Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438, 441–42 (Minn. Ct. App. 1985), or a near-miss by an out-of-control vehicle, *see Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 765–66, 70–71 (Minn. 2005). Powell therefore cannot prevail on this claim as a matter of law, so Defendants are entitled to summary judgment.

3

Finally, there are Powell's negligence claims against the City of Robbinsdale and the City of Brooklyn Center. Am. Compl. ¶¶ 76–84. Powell seems to assert four theories of negligence: negligent hiring, supervising, training, and retaining of the police officers involved in this case. *See id.* ¶ 77. Powell essentially wants to hold the Cities liable for not having adequate policies regarding sedation of suspects, for not adequately investigating his claims after the incident, and for failing to take remedial measures against the involved officers. Mem. in Opp'n at 52. But these negligence claims are not the means to the end Powell seeks. If the officers' conduct did not violate Powell's constitutional rights, it necessarily follows that the Cities that hired, trained, supervised, and retained these officers were not negligent. Moreover, Minnesota law does not recognize a claim for negligent training. *Burns v. Winroc Corp.*, 565 F. Supp. 2d 1056, 1068 (D. Minn. 2008). Both Cities are therefore entitled to summary judgment on Plaintiff's negligence claims.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. The Robbinsdale Defendants' summary-judgment motion [ECF No. 57] is **GRANTED**.

2. The Brooklyn Center Defendants' summary-judgment motion [ECF No. 64] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 19, 2019      s/ Eric C. Tostrud
              Eric C. Tostrud
              United States District Court